UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ROBERT E. LIFSON, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>    v.<br><br>ASSISTED LIVING CONCEPTS, INC. and LAURIE A. BEBO,<br><br>          Defendants. | Case No.<br><br><br>CLASS ACTION<br><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, Robert E. Lifson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against the above-named defendants (collectively, "Defendants"), alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, the review of Securities and Exchange Commission ("SEC") filings; media and investigative reports; trading data; press releases and other public statements published by Assisted Living Concepts, Inc. ("ALC," or the "Company"); and other publicly-available information:

**NATURE OF THE ACTION**

1.      This is a securities class action on behalf of individuals and entities who purchased or otherwise acquired the Class A Common Stock of ALC between March 12, 2011 and August 6, 2012, inclusive (the "Class Period"), and seeks damages for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     ALC and its subsidiaries operate licensed assisted living and senior living facilities.

3.     Since 2006, in an effort to increase revenue and operating income, ALC has sought to replace residents participating in Medicaid with "private pay" residents.

4.     This transition significantly reduced occupancy rates at ALC facilities, which declined from 85% to 62.4% between 2006 and 2011.

5.     In January 2008, ALC acquired eight facilities leased from Ventas Realty, Limited Partnership ("Ventas"). Under the terms of the lease with Ventas (the "Ventas Lease"), ALC was obligated to maintain an overall occupancy rate of at least 82%. In addition, the Ventas Lease required ALC to maintain all regulatory licenses required to operate the leased facilities for their intended use.

6.     In its quarterly and annual SEC filings during the Class Period, ALC affirmatively and unqualifiedly stated that it was in compliance with all occupancy and operating covenants under the Ventas Lease, and it acknowledged any default under the "operating and occupancy covenants" in such lease "could have a material adverse impact on our operations."

7.     Undisclosed to investors, there is substantial evidence that during the Class Period, ALC was in breach of the Ventas Lease's minimum occupancy covenants, which it concealed by treating units leased to employees as bona fide rentals by third parties.

8.     Also undisclosed to investors, until revealed in a lawsuit filed by Ventas in late April 2012 (the "Ventas Litigation"), state regulators in Georgia and Alabama served notices in February and March 2012 of their intent to revoke licenses for three of the facilities leased from Ventas.

9.     In early May 2012, the audit committee (the "Audit Committee") of ALC's board of directors (the "Board") launched an investigation after receiving an internal whistleblower complaint concerning "possible irregularities in connection with" the Ventas Lease.

10.     In late May 2012, ALC announced that its President and Chief Executive Officer, Defendant Laurie A. Bebo ("Bebo") "is no longer the President, Chief Executive Officer ('CEO') or an employee of ALC, effective immediately."

11.     On June 21, 2012, ALC announced a settlement of the Ventas Litigation. As a result of the settlement, ALC reported a net loss of $19.5 million for the first six months of 2012, a loss nearly equal in size to ALC's entire net income for 2011.

12.     At the close of the Class Period, on August 7, 2012, the Company announced that it was the subject of an investigation by the SEC concerning a number of topics, including "compliance with occupancy covenants" under the Ventas Lease and the "leasing of units for employee use."

13.     As further detailed below, during the Class Period, Defendants thus made false and misleading statements and omitted material information concerning ALC's compliance with the Ventas Lease. As a result of Defendants' wrongful acts and omissions, Plaintiff and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the Company's principal executive offices are located in this District, Defendants do business in this

District, and many of the acts and practices complained of herein occurred in substantial part in this District.

17.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

18.    Plaintiff purchased ALC Class A Common Stock as set forth in the accompanying certification, and has been damaged thereby.

19.    ALC is a publicly-traded company whose shares are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "ALC." ALC's headquarters are located at W140 N8981 Lilly Road, Menomonee Falls, Wisconsin. As of August 1, 2012, the Company had 20,071,195 shares of Class A Common Stock outstanding, with a total market capitalization immediately following the close of the Class Period of approximately $158 million.

20.    Defendant Bebo became ALC's President and Chief Executive Officer ("CEO") in November 2006 and was elected a director of the Company in May 2008. Her employment with ALC was terminated on May 29, 2012.

21.    By virtue of her position at ALC, Bebo had access to the adverse and undisclosed information about ALC's business conditions and financial results. Bebo directly participated in the management of ALC, was directly involved in the operations of ALC at the highest levels, was privy to information concerning the undisclosed business conditions and financial results of ALC and was involved in the dissemination of the materially false and misleading statements and information alleged herein.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired ALC Class A Common Stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, other officers and directors of ALC, members of their immediate families and legal representatives, heirs, successors or assigns, and any entity in which they have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, ALC Class A Common Stock was actively traded on the NYSE in an efficient market. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, ALC has more than 20 million shares outstanding and Plaintiff believes that there are hundreds if not thousands of members in the proposed Class.

24.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as described herein.

25.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b)     whether public statements made by Defendants to the investing public misrepresented or omitted material facts;

(c)     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(d)     whether the price of ALC Class A Common Stock was artificially inflated during the Class Period; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

A.     **Background Concerning the Company**

28.     ALC and its subsidiaries operate senior living residences that seek to provide senior citizens with a supportive, home-like setting with care and services, including 24-hour assistance with activities of daily living, medication management, life enrichment, health and wellness, and other services.

29.     ALC became an independent, publicly traded company listed on the NYSE on November 10, 2006, when shares of ALC Class A Common Stock were distributed by Extendicare Inc., now known as Extendicare Real Estate Investment Trust, to its stockholders.

## B.    The CaraVita Facilities and the Ventas Lease

30.    On December 31, 2007, ALC completed the acquisition of eight assisted living residences doing business as CaraVita (the "CaraVita Facilities") with a total of 541 units for a purchase price of $14.4 million. Five of the eight CaraVita Facilities are located in Georgia, the others are located in Alabama, South Carolina and Florida.

31.    Until June 2012, ALC leased the CaraVita Facilities from Ventas under an Amended and Restated Master Lease Agreement between Ventas and various ALC subsidiaries, dated as of January 1, 2008, referred to herein as the Ventas Lease. In addition, ALC directly guaranteed the Ventas Lease.

32.    ALC identified the Ventas Lease (sometimes referred to in ALC's SEC filings as the "CaraVita operating lease") as a material definitive agreement in its Form 8-K filed January 7, 2008.

## C.    Terms of the Ventas Lease

33.    Section 8.2.5 of the Ventas Lease set forth operating covenants as to the eight CaraVita Facilities, requiring:

- each facility to maintain quarterly occupancy of at least 65% and trailing twelve month occupancy of at least 75%;

- the portfolio to maintain trailing twelve month occupancy of at least 82%;

- each facility to maintain a coverage ratio of 0.8 to 1.0; and

- the portfolio to maintain a coverage ratio of 1.0 to 1.0.

34.    In addition, various provisions of the Ventas Lease required ALC's respective operating subsidiaries to obtain and maintain any and all licenses, permits, or other governmental authorizations required for the operation of the facilities for their intended use, and:

- take all necessary action to maintain any authorizations required for operation of the facility (§ 8.2.1);

- comply with all applicable laws and keep all authorizations in full force and effect (§ 8.2.4);

- make a continuing warranty that there would be no threatened, existing or pending revocation, suspension, or termination of any Authorization (§ 10.8); and

- make a continuing warranty that they would not commit any act which may give any government authority the right to cause such ALC Entity to lose an Authorization (§ 10.15).

35.     Among the remedies provided to Ventas in the Ventas Lease upon an Event of Default were the option to terminate the Ventas Lease (§ 17.2.1); to terminate the ALC subsidiaries' right to possession of the leased properties (§ 17.2.1); and to obtain damages, including accelerated rent (§ 17.4).

36.     In its Class Period filings, ALC acknowledged that its failure to comply with the operating and occupancy covenants in the Ventas Lease "could have a material adverse impact on our operations."

### D.     ALC Repeatedly and Unqualifiedly Stated Its Compliance with the Ventas Lease Covenants

37.     Throughout the Class Period, ALC unqualifiedly stated in its filings with the SEC that it was in compliance with the Ventas Lease operating and occupancy covenants. In each of its Form 10-K and Form 10-Q filings during the Class Period, ALC assured investors that "[w]e were in compliance with all such [operating and occupancy] covenants as of [the end of the reporting period]."

38.     In addition, ALC's compliance with the Ventas Lease covenants was a specific focus of SEC review. An August 4, 2011 SEC filing by the Company reflected that the SEC had requested further disclosures about ALC's performance under the Ventas Lease covenants and that ALC, in response, stated its belief that such disclosures were not necessary, because

"[b]ased upon current and reasonably foreseeable events and conditions, the Company does not believe that it has a reasonably likely degree of risk of breach of the [Ventas Lease] covenants."

39.     Addressing the SEC's concerns, ALC's Class Period annual and quarterly SEC filings following the August 4, 2011 correspondence also contained language stating that "Based upon current and reasonably foreseeable events and conditions, ALC does not believe that there is a reasonably likely degree of risk of breach of the [Ventas Lease] covenants."

**E.     ALC's Shift to "Private Pay" Residents and the Resulting Decline in Occupancy Rates**

40.     Starting in 2006, it has been ALC's stated goal to reduce the proportion of residents who pay through Medicaid, and increase the proportion of "private pay" residents. Between 2006 and 2009, ALC reduced the proportion of Medicaid participants from 29.8% to 7.2%. ALC Form 10-K filed March 11, 2010 ("2009 10-K"), at 22.

41.     ALC has stated, however, that its "planned exit from Medicaid programs has resulted in a significant number of vacancies" and a "significant number of unoccupied units." ALC Form 10-K filed March 12, 2012 ("2011 10-K"), at 11, 21.

42.     While data is not available on a per-facility basis, the average occupancy of ALC-operated facilities has steadily declined from 85% in 2006 to 62.4% in 2011. *Id.* at 20-21; 2009 10-K at 22. ALC's average occupancy rates in 2011 were therefore far below the occupancy rates required by the Ventas Lease.

**F.     The State Regulatory Violations**

43.     On February 13, 2012, the Georgia Department of Community Health ("Georgia DCH") sent to ALC's Tara Plantation facility in Cumming, Georgia a "Notice of Intent to Revoke Permit." The notice informed Tara Plantation that Georgia DCH proposed to revoke the license to operate the facility. Georgia DCH determined, as stated in the letter, that the facility

"was not in substantial compliance" with applicable rules and regulations and that the facility had "falsified records maintained by the facility." The letter enclosed a twelve page "Statement of Deficiencies" detailing its findings.

44. On March 27, 2012, the Alabama Department of Public Health ("Alabama DPH") sent to ALC's CaraVita Village facility in Montgomery, Alabama a "Notice of License Revocation Hearing." The letter informed the facility that Alabama DPH proposed to revoke the license to operate the facility, as the facility "was in violation of the State Board of Health Rules for Assisted Living Facilities," and the "deficiencies are deemed to be conduct and practices detrimental to the welfare of the residents of this facility." The letter attached an 85-page "Statement of Deficiencies" that cited numerous violations.

45. On March 30, 2012, Georgia DCH sent to ALC's Peachtree Estates facility in Dalton, Georgia a "Notice of Intent to Revoke Permit," which informed the facility of its intent to revoke the permit to operate Peachtree Estates. The Georgia DCH letter noted that it had found that "the facility was not in substantial compliance" with applicable rules and regulations and that "the conditions in the facility pose an imminent and serious threat to the physical and emotional health and safety to persons in care." The letter attached a forty-page inspection report that cited numerous violations for failure to provide proper care to the residents.

46. ALC did not publicly disclose its receipt of these regulatory notices. Investors first learned of the regulatory notices listed above from Ventas' filings in the Ventas Litigation, and subsequently when the Company disclosed such litigation.

## G. The Ventas Litigation and the Occupancy Covenant Violations

47. On April 26, 2012, Ventas commenced the Ventas Litigation, seeking a declaratory judgment that ALC was in default and material breach of the Ventas Lease and had forfeited its right to possession of the CaraVita Facilities.

- 10 -

48.     The complaint, captioned *Ventas Realty, Limited Partnership v. ALC CVMA, LLC, et al.*, No. 12-cv-03107, was filed in the United States District Court for the Northern District of Illinois and alleged that ALC's receipt of notices of intent to revoke permits from the Georgia DCH and Alabama DPH constituted a breach of the Ventas Lease.

49.     The Ventas Litigation was first disclosed by the Company in a May 4, 2012 Form 8-K filing with the SEC.  The Form 8-K filing also disclosed that "On May 3, 2012, the Company's Board of Directors determined to investigate possible irregularities in connection with the Company's lease with Ventas and retained counsel for such purpose."

50.     In a subsequent filing in the Ventas Litigation, ALC further disclosed that the Board's decision to conduct an investigation concerning the Ventas Lease resulted from an internal whistleblower report concerning the Ventas Lease.

51.     Subsequently, on May 9, 2012, ALC received a letter from Ventas asserting that ALC violated the Ventas Lease in several ways, including that ALC "submitted fraudulent information by treating units leased to employees as bona fide rentals by third parties and, therefore, may not have been in compliance with the minimum occupancy covenant and coverage ratio covenants," and that such actions constituted events of default under the lease. ALC Form 8-K, filed May 14, 2012.

52.     Ventas subsequently propounded a number of interrogatories to ALC in the Ventas Litigation concerning ALC's practice of leasing units to employees.  *See* Plaintiff's Second Set of Interrogatories to Defendants at 5-6, ECF No. 50-2.  ALC attempted to avoid answering those interrogatories by seeking a protective order (ECF No. 39).  On June 12, 2012, the Court largely denied ALC's application (ECF No. 51).

53.     According to an affidavit submitted in the Ventas Litigation, the affiant, a pro bono attorney representing residents of the Peachtree Estates facility and their families, received calls in the second week of May 2012 from employees of one of the Georgia facilities whose licenses was to be revoked, stating that ALC headquarters personnel were actively shredding files of the facility and that the employees were instructed not to reveal any of the conduct currently taking place at the facility.

54.     On May 11, 2012, the Company stated that, due to the Audit Committee investigation, it would not be able to timely file its first quarter 2012 Form 10-Q, and could not predict "whether the findings of the investigation would have any impact on the Ventas lease, the Company's results of operations or financial condition, or other matters relating to the Company and its business." ALC Form NT 10-Q, filed May 11, 2012.

55.     Ventas amended its complaint on May 14, 2012, adding allegations that ALC's proposed voluntary termination of the license to operate the CaraVita Village facility in Alabama in May 2012 was an additional breach of the lease.

56.     Prior to its settlement of the Ventas Litigation, discussed *infra*, ALC estimated that if Ventas was successful in pursuing its claims and invoked the remedies available to it under the Ventas Lease (such as acceleration of rent and ALC's dispossession of the facilities), the Company could experience a reduction in net income of more than $17 million. ALC Form 8-K, filed May 14, 2012. In comparison, ALC reported net income of $24.4 million for the year ended December 31, 2011 and $16.5 million for the year ended December 31, 2010. ALC Form 8-K, filed Mar. 8, 2012; 2011 Form 10-K, at 19.

57.    On May 30, 2012, the Company issued a Form 8-K announcing that Bebo "is no longer the President, Chief Executive Officer ('CEO') or an employee of ALC, effective immediately." ALC Form 8-K, filed May 30, 2012.

58.    On June 15, 2012, just three days after it was denied a protective order, ALC entered into an agreement with Ventas by which ALC paid Ventas $100 million for the purchase of the eight CaraVita Facilities and four other properties that ALC also leased from Ventas. ALC Form 8-K, filed June 21, 2012. The settlement included $3 million for a "litigation settlement fee," and the Company also agreed to pay Ventas' expenses in connection with the litigation.

59.    In a Form 8-K filed August 3, 2012, ALC reported a net loss of $19.5 million for the first six months of 2012, an amount close to the total net income of $24.4 million recorded in 2011 and a loss larger than the total net income earned by the company in any preceding year – largely due to the "write off of $22.7 million related to litigation settlement and a lease termination fee, $5.3 million write-off of operating lease intangible, and $0.6 million of deal costs . . . ."

60.    Finally, in a Form 8-K filed by ALC on August 7, 2012, ALC disclosed that on August 2, 2012, the SEC commenced an investigation of ALC. According to the filing, the SEC subpoenaed documents on "a number of topics," including "compliance with occupancy covenants" in the Ventas Lease and "leasing of units for employee use."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD

61.    ALC's Class Period SEC filings repeatedly addressed the Ventas Lease and contained false and misleading statements and material omissions concerning the Company's compliance with the covenants therein. (Emphasis in **bold italics** below has been added.)

62.     ALC's Form 10-K filed March 10, 2011 ("2010 10-K"), at 45, stated:

**Future Liquidity and Capital Resources**

…

However, the failure to meet ***certain operating and occupancy covenants*** in the [Ventas Lease] could give the lessor the right to accelerate the lease obligations and terminate our right to operate all or some of those properties. ***We were in compliance with all such covenants as of December 31, 2010***, but continued poor economic conditions could constrain our ability to remain in compliance in the future. Failure to comply with those obligations could result in our being required to make an accelerated payment of the present value of the remaining obligations under the lease through its expiration in March 2015 (approximately $20.9 million as of December 31, 2010), as well as the loss of future revenue and cash flow from the operations of those properties. ***The acceleration of the remaining obligation and loss of future cash flows from operating those properties could have a material adverse impact on our operations.***

63.     ALC's Form 10-Q, filed May 5, 2011, and Form 10-Q/A, filed May 9, 2011, at 32

reiterated that ALC was in compliance with the Ventas Lease covenants:

**Future Liquidity and Capital Resources**

…

However, the failure to meet ***certain operating and occupancy covenants*** in the [Ventas Lease] could give the lessor the right to accelerate the lease obligations and terminate our right to operate all or some of those properties. ***We were in compliance with all such covenants as of March 31, 2011***, but continued poor economic conditions could constrain our ability to remain in compliance in the future. Failure to comply with those obligations could result in our being required to make an accelerated payment of the present value of the remaining obligations under the lease through its expiration in March 2015 (approximately $19.9 million as of March 31, 2011), as well as the loss of future revenue and cash flow from the operations of those properties. ***The acceleration of the remaining obligation and loss of future cash flows from operating those properties could have a material adverse impact on our operations.***

64.     On August 4, 2011, ALC filed a CORRESP filing with the SEC containing correspondence between ALC and the SEC, in which the SEC asked for additional disclosures about the Ventas Lease, and which ALC responded were not necessary. The CORRESP filing cites ALC's disclosure in its 2010 10-K that "continued poor economic conditions could constrain our ability to remain in compliance in the future" with the Ventas Lease covenants and references a comment by the SEC that "to the extent that you remain at risk of non-compliance, disclose the [Ventas Lease] covenants and your performance relative thereto. Confirm that you will disclose any other material contractual covenants for which you are at risk of default, as well as your relative performance." According to the CORRESP filing, the Company responded that additional disclosures about the lease covenants and ALC's performance relative thereto were "not meaningful or required" because, *inter alia*, "Based upon current and reasonably foreseeable events and conditions, the Company does not believe that it has a reasonably likely degree of risk of breach of the [Ventas Lease] covenants."

65.     ALC's Form 10-Q, filed August 8, 2011, at 36 reiterated that ALC was in compliance with the Ventas Lease covenants:

**Future Liquidity and Capital Resources**

…

However, the failure to meet ***certain operating and occupancy covenants*** in the [Ventas Lease] could give the lessor the right to accelerate the lease obligations and terminate our right to operate all or some of those properties. ***We were in compliance with all such covenants as of June 30, 2011***, but continued poor economic conditions could constrain our ability to remain in compliance in the future.

Failure to comply with those obligations could result in our being required to make an accelerated payment of the present value of the remaining obligations under the lease through its expiration in March 2015 (approximately $18.9 million as of June 30, 2011), as well as the loss of future revenue and cash flow from the operations of those properties. ***The***

*acceleration of the remaining obligation and loss of future cash flows from operating those properties could have a material adverse impact on our operations. Based upon current and reasonably foreseeable events and conditions, ALC does not believe that there is a reasonably likely degree of risk of breach of the [Ventas Lease] covenants.*

66.    ALC's Form 10-Q, filed November 8, 2011, at 36-37 again reiterated that ALC was in compliance with the Ventas Lease covenants:

**Future Liquidity and Capital Resources**

…

However, the failure to meet *certain operating and occupancy covenants* in the [Ventas Lease] could give the lessor the right to accelerate the lease obligations and terminate our right to operate all or some of those properties. *We were in compliance with all such covenants as of September 30, 2011*, but continued poor economic conditions could constrain our ability to remain in compliance in the future.

Failure to comply with those obligations could result in our being required to make an accelerated payment of the present value of the remaining obligations under the lease through its expiration in March 2015 (approximately $17.8 million as of September 30, 2011), as well as the loss of future revenue and cash flow from the operations of those properties. *The acceleration of the remaining obligation and loss of future cash flows from operating those properties could have a material adverse impact on our operations. Based upon current and reasonably foreseeable events and conditions, ALC does not believe that there is a reasonably likely degree of risk of breach of the [Ventas Lease] covenants.*

67.    ALC's Form 10-K, filed March 12, 2012, at 43 reiterated that ALC was in compliance with the Ventas Lease covenants:

**Future Liquidity and Capital Resources**

…

However, the failure to meet *certain operating and occupancy covenants* in the [Ventas Lease] could give the lessor the right to accelerate the lease obligations and terminate our right to operate all or some of those properties. *We were in compliance with all such covenants as of*

*December 31, 2011*, but continued poor economic conditions could constrain our ability to remain in compliance in the future.

Failure to comply with those obligations could result in our being required to make an accelerated payment of the present value of the remaining obligations under the lease through its expiration in March 2015 (approximately $16.7 million as of December 31, 2011), as well as the loss of future revenue and cash flow from the operations of those properties. *The acceleration of the remaining obligation and loss of future cash flows from operating those properties could have a material adverse impact on our operations. Based upon current and reasonably foreseeable events and conditions, ALC does not believe that there is a reasonably likely degree of risk of breach of the [Ventas Lease] covenants.*

68.    The statements and omissions referenced in paragraphs 62 through 67 above were materially false and/or misleading because they stated that ALC was in compliance with the operating and occupancy covenants of a material contract, when, in reality, ALC (i) was not in compliance with the minimum occupancy covenants in the Ventas Lease, and (ii) beginning in February 2012, received notices of intent to revoke permits from state regulators with respect to its licenses to operate three of the CaraVita Facilities, and therefore was not in compliance with the regulatory provisions of the Ventas Lease.

### THE TRUTH BEGINS TO EMERGE

69.    On May 4, 2012, ALC filed a Form 8-K disclosing that on April 26, 2012, Ventas had commenced the Ventas Litigation.  In the same Form 8-K filing, ALC also disclosed that "On May 3, 2012, the Company's Board of Directors determined to investigate possible irregularities in connection with the Company's lease with Ventas and retained counsel for such purpose."

70.    On the news of the Ventas Litigation and internal investigation, ALC stock declined $2.35 per share, or more than 12%, to close at $16.69 per share on May 4, 2012.

71.     On May 11, 2012, ALC filed Form NT 10-Q, stating that it would not be able to timely file its first quarter 2012 Form 10-Q due to the Audit Committee investigation.

72.     On the news of the delayed Form 10-Q filing, ALC stock declined an additional $1.30 per share, or more than 7%, to close at $16.28 per share on May 11, 2012.

73.     On May 30, 2012, ALC filed a Form 8-K announcing Defendant Bebo's abrupt departure from the Company.

74.     On the news of Defendant Bebo's departure, ALC stock declined $1.20 per share, or 8.3%, to close at $13.28 per share.

75.     On August 7, 2012, ALC filed a Form 8-K announcing the SEC investigation and its subpoena of documents, *inter alia*, related to ALC's compliance with occupancy covenants in the Ventas Lease.

76.     On the news of the SEC investigation, ALC stock declined $2.88 per share, or 26.7%, to close at $7.89 per share on August 7, 2012.

## LOSS CAUSATION

77.     Defendants made widely-disseminated false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ALC Class A Common Stock.  Later, when Defendants' prior misrepresentations and omissions became apparent to the market, the price of ALC Class A Common Stock fell sharply, as the prior artificial inflation was removed from the price.

78.     As a result of their purchases of ALC Class A Common Stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## ADDITIONAL ALLEGATIONS OF SCIENTER

79.     As illustrated by her position with the Company, Defendant Bebo had and used her influence and control to further the scheme alleged herein. Defendant Bebo had broad responsibilities which included communicating with the financial markets and providing the markets with information about ALC's business conditions and financial results. Defendant Bebo was privy to and directed the making of the disclosures concerning the Company. By making the misleading statements contained herein, Bebo knew that she would artificially inflate the value of the Company's common stock. Her actions in doing so resulted in damage to Plaintiff and the Class.

80.     On May 2, 2012, the Chairperson of ALC's Audit Committee received a written communication from an ALC whistleblower citing irregularities with respect to the Ventas Lease.

81.     On May 3, 2012, the Company's Board of Directors determined to investigate "possible irregularities" in connection with the Ventas Lease.

82.     On May 9, 2012, ALC received a letter from Ventas asserting that ALC violated the Ventas Lease in several ways, including that ALC "submitted fraudulent information by treating units leased to employees as bona fide rentals by third parties and, therefore, may not have been in compliance with the minimum occupancy covenant and coverage ratio covenants," and that such actions constituted events of default under the Ventas Lease.

83.     According to an affidavit submitted in the Ventas Litigation, the affiant received calls during the second week of May 2012 from employees of one of the Georgia facilities whose licenses was to be revoked, stating that ALC headquarters personnel were actively shredding files of the facility and that the employees were instructed not to reveal any of the conduct currently taking place at the facility.

- 19 -

84. On May 30, 2012, ALC announced that Defendant Bebo was no longer employed by the Company, "effective immediately." ALC Form 8-K, filed May 30, 2012.

85. On August 2, 2012, the SEC commenced an investigation of ALC, subpoenaing documents "on a number of topics, including, among others, compliance with occupancy covenants in the now-superseded lease with Ventas Realty, Limited Partnership and leasing of units for employee use." Form 8-K, filed Aug. 7, 2012.

**COUNT I**
**For Violations of § 10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

86. Plaintiff hereby incorporates paragraphs 1 through 85 by reference.

87. Throughout the Class Period, Defendants, individually and in concert, directly or indirectly made various false statements of material facts and omitted to state material facts necessary to make the statements made not misleading to Plaintiff and the other members of the Class.

88. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of ALC Class A Common Stock during the Class Period.

89. Defendant Bebo and other senior executives of the Company had actual knowledge of the material omissions and/or the falsity of the material statements set forth above,

and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other ALC personnel to members of the investing public, including Plaintiff and the Class.

90.     As a result of the foregoing, the market price of ALC Class A Common Stock was artificially inflated during the Class Period.   In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of ALC securities during the Class Period in purchasing ALC common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

91.     Had Plaintiff and the other members of the Class been aware that the market price of ALC Class A Common Stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased ALC common stock at the artificially inflated prices that they did, or at all.

92.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

93.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of ALC common stock during the Class Period.

## COUNT II
### For Violation of § 20(a) of the Exchange Act
### (Against Defendant Bebo)

94.    Plaintiff hereby incorporates paragraphs 1 through 93 by reference.

95.    Defendant Bebo acted as a controlling person of ALC within the meaning of Section 20(a) of the Exchange Act.   By reason of her position of control and authority as a senior officer, Bebo was able to, and did, control the contents of the various reports, press releases and public filings that ALC disseminated in the marketplace during the Class Period concerning ALC's compliance with the operating and occupancy covenants of the Ventas Lease.

96.    During the Class Period, Bebo exercised her power and authority to cause ALC to engage in the wrongful acts complained of herein.   By reason of such conduct, Bebo is liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23, and certifying Plaintiff as the Class representative;

B.    Awarding Plaintiff and the members of the Class damages, including interest;

C.    Awarding Plaintiff reasonable costs and attorneys' fees, expert fees and other costs; and

D.    Awarding such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a jury trial.


Dated: August 29, 2012

s/K. Scott Wagner
K. Scott Wagner (SBN 1004668)
**HALE & WAGNER, S.C.**
839 N. Jefferson Street, Suite 400
Milwaukee, Wisconsin 53202
**Telephone**: 414.278.7000
**Facsimile**: 414.278.7590
**Email**: ksw@halewagner.com


WOHL & FRUCHTER LLP
Ethan D. Wohl
J. Elazar Fruchter
Krista T. Rosen
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004
ewohl@wohlfruchter.com
jfruchter@wohlfruchter.com
krosen@wohlfruchter.com

*Attorneys for Plaintiff*