# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

PENSION TRUST FUND FOR OPERATING
ENGINEERS and ROBERT LIFSON,

Plaintiffs,

v.

ASSISTED LIVING CONCEPTS, INC.,
and LAURIE BEBO,

Defendants.

Case No. 12-CV-884-JPS

ORDER

The lead plaintiff, Pension Trust Fund for Operating Engineers ("Pension Trust"), filed its amended complaint on February 15, 2013. (Docket #36). The amended complaint alleges that the defendants, Assisted Living Concepts, Inc. ("ALC"), and Laurie Bebo ("Bebo"), violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act," 15 U.S.C. §§ 78j(b) and 78t (a)) and SEC. Rule 10b-5. On April 1, 2013, ALC and Bebo both separately moved to dismiss the amended complaint. (Docket #40, #43). The parties have fully briefed the matter, and it is now ripe for decision. (Docket #41, #44, #58, #59, #62).

1.      BACKGROUND[1]

The factual and legal background underlying this case is fairly complex. Therefore, the Court provides this general overview: first, providing some information regarding the parties involved in this suit; second, addressing the defendants' actions that gave rise to Pension Trust's

---

[1] For purposes of addressing this motion to dismiss, the Court will use the facts alleged by Pension Trust in its motion to dismiss. The Court's recitation of the background does not constitute findings of fact, but instead merely serves as a backdrop for analysis of the defendants' motions to dismiss.

claims; and, finally, examining Pension Trust's specific claims against the defendants and Pension Trust's complaint in greater detail.

### 1.1    Parties

ALC is a publicly-traded company that operates senior assisted living facilities. (Compl. ¶¶ 1, 17). It oversees the operations of approximately 200 assisted living facilities, which together contain over 9,000 separate units. (Compl. ¶ 1).

Bebo served as ALC's President and CEO from November of 2006 until May of 2012, when she was fired as a result of the events giving rise to this suit (which the Court will discuss in further detail below). (Compl. ¶ 18).

Pension Trust is a defined benefit plan; in connection with its investment operations, Pension Trust owns some of ALC's publicly-traded stock. (Compl. ¶ 16).

### 1.2    Defendants' Operations and Underlying Activity

#### 1.2.1    Shift to Private-Pay Focus

During its early years of operation, ALC provided services to residents on Medicaid and other government assistance programs. (*See* Compl. ¶ 25). As such, the government would pay ALC for any services ALC provided to Medicaid recipients. (*See* Compl. ¶ 25).

However, due to tightening budgets, the pay rates for housing government-assistance recipients began to fall; in response to that, ALC decided to seek more "private pay" residents. (Compl. ¶ 25). Private pay residents are those whose bills are typically paid individually or by family members, as opposed to being paid by governmental units. (Compl. ¶ 25). ALC decided to switch its focus to private pay residents because private pay revenue often provided higher profit margins (as their rates were not capped

by the government), and enabled ALC to reduce its dependence upon Medicaid, which ALC saw as growing less profitable and more unstable. (*See* Compl. ¶ 25).

ALC succeeded in its mission of reducing the number of its facilities that accepted Medicaid. (Compl. ¶ 25). By 2010, Medicaid recipients accounted for only 2% of ALC's overall revenues, while the number of ALC residents who paid with Medicaid dropped to approximately 7.2% of the total number of ALC's patients. (Compl. ¶¶ 25, 27).

Unfortunately, while the number of Medicaid recipients declined, ALC did not replace those with a proportional number of private pay residents. (Compl. ¶ 28). The total occupancy level decline from 85% at the 2006 initiation of the private pay strategy to only 62.4% as of December 31, 2011. (Compl. ¶ 28). Of course, a portion of that decline may be attributable to a simultaneous increase in the number of units operated by ALC, as ALC added a total of 347 units between 2007 and 2010. (Compl. ¶ 26).

### 1.2.2 CaraVita Lease

While attempting to expand, ALC entered a lease agreement with Ventas Realty ("Ventas"). Pursuant to the lease agreement—known as the "CaraVita Lease" (also referred to in this document as "the Lease" or "the Lease Agreement")—ALC leased eight senior living facilities in the Southeastern United States, consisting of a total of 541 units. (Compl. ¶ 33).

The Lease imposed a number of positive and negative obligations upon ALC, including the following relevant obligations:

(1)     ALC must comply with all laws and insurance requirements (Docket #58, Ex. A, at ¶ 8.2.4),[2] and would be deemed in default if it receives either:

    (a)     a written notice of any pending revocation of its licenses or permits (Docket #58, Ex. A, at ¶ 17.1.12); or

    (b)     a government determination that any facility is operating below the required levels and is not brought back into compliance within a certain number of days (Docket #58, Ex. A., at ¶ 17.1.15);

(2)     ALC must affirm at the time of the lease *and continue to ensure throughout the life of the contract*[3] that

    (a)     it is fully and validly licensed and certified to operate the facility (Docket #58, Ex. A, at ¶ 10.9); and

    (b)     it is in compliance with all laws and other safety standards (Docket #58, Ex. A, at ¶ 10.15);

(3)     ALC must promptly notify Ventas if:

    (a)     any event occurs that constitutes a breach of the Lease or if ALC was notified (such as by a governmental

---

[2] Although Pension Trust did not attach a copy of the Lease to its complaint, the Court may nonetheless consider the Lease in deciding this motion to dismiss (without the need to convert the motion to a Rule 12(c) motion), as Pension Trust ultimately submitted the document as an attachment to its response brief (Docket #58, Ex. A) and the document is both referenced in Pension Trust's complaint and central to Pension Trust's claim. *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citing *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)).

[3] The Court will address this point further later in this order. Suffice it to say that this required that ALC make certain representations and warranties upon entering the Lease; however, the Lease also requires that ALC continue to abide by its representations and warranties throughout the life of the contract. (Docket #58, Ex. A, at ¶ 10 ("Tenant hereby makes the following representations and warranties, as of the date hereof…. Tenant's representations and warranties…*shall continue in full force and effect, and remain true and correct, and constitute continuing covenants of Tenant*, until Tenant's obligations hereunder have been performed in full." (emphasis added))).

agency) of "actual, pending, threatened or contemplated increase" of liability or malpractice costs (Docket #58, Ex. A, at ¶ 8.2.3(a)(ii)); or

(b)     ALC received notice of any potential litigation or investigation of ALC that could affect ALC's operation of the leased facilities (Docket #58, Ex. A, at ¶¶ 8.2.3(c), 8.3);

(4)     ALC must maintain occupancy at or above 65% (75% for trailing 12 months) (Docket #58, Ex. A, at ¶ 8.2.5(d));

(5)     ALC must keep each facility in good repair (Docket #58, Ex. A, at ¶ 9.1.1).

(6)     ALC may not "jeopardize in any manner [its own] participation in Medicare, Medicaid or any other Third Party Payor Programs…" (Docket #58, Ex. A, at ¶ 8.1.11(e)); and

(7)     ALC may not make any false or misleading representations to Ventas (Docket #58, Ex. A, at ¶ 17.1.5).

Any violation of those terms—even as to a single facility, so long as the violation occurred for a period of 90 days or more—entitles Ventas to terminate the entire lease, as to every facility. (Docket #58, Ex. A, at ¶¶ 17.2.1, 17.2.2).

### 1.2.3   Decline in Service and Inflated Occupancy at Ventas Facilities

After entering this lease, ALC began to operate the Ventas facilities. (*See, e.g.*, Compl. ¶ 37). ALC continued to shift toward a private pay business model throughout this time period. (*See, e.g.*, Compl. ¶¶ 25, 27).

However, the total occupancy level at ALC's facilities continued to decline, and apparently ALC had to begin searching for ways to maintain or increase its margins. (*See, e.g.*, Compl. ¶¶ 28–30). This led ALC to begin cutting costs. (Compl. ¶¶ 29, 30). Allegedly, ALC accomplished this through understaffing its facilities and hiring less qualified employees. (Compl. ¶ 29).

Of course, understaffing healthcare facilities is not without ramifications, and ALC began to receive citations from authorities at the facilities it leased from Ventas. (Compl. ¶¶ 39–117).[4] Those citations stemmed from various poor conditions within the facilities. (Compl. ¶¶ 39–117).

But those citations were not ALC's only troubles: as already discussed, occupancy rates continued to decline, and ALC allegedly began to falsely report certain occupancy data.[5] (Compl. ¶¶ 28, 95, 116, 119–124, 127–129). For example, ALC allegedly would temporarily house residents for whom it lacked the capacity to treat and rent rooms to third parties in order to temporarily inflate their occupancy rate. (Compl. ¶¶ 95, 116, 119–123).

---

[4] Pension Trust uses the statements of confidential witnesses to support a vast number of specific violations it alleges occurred within the Ventas facilities. (*See, e.g.*, Compl. ¶ 39–117 (confidential witness statements discussed throughout)). Those confidential witness statements do, indeed, highlight some nefarious practices and inflame one's passions. They do not, however, substantially change the Court's analysis. Rather, what is important is the simple fact that violations occurred, for which ALC received citations. Nonetheless, the Court will give at least some weight to these statements, as there are a large number of statements, the statements tend to corroborate one another, and there is specific information provided about each of the confidential witnesses, all in satisfaction of the requirements of *Makor II. Makor Issues & rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711–12 (7th Cir. 2008).

[5] ALC supports this assertion, too, with substantial confidential witness testimony. (*See, e.g.*, Compl. ¶¶ 95, 116, 119–124, 127–129). However, compared to the allegations on conditions, which were separately supported by citations from the government, this allegation lacks verifiable support, and the issue of confidential witnesses becomes more concerning. However, even applying the required "heavy discount" to the confidential witness statements on this allegation, *see, e.g.*, *Higginbotham v. Baxter Int'l, Inc.*,, 495 F.3d 753, 757 (7th Cir. 2007), *City of Livonia Emp.'s Ret. Sys. v. The Boeing Co.*, 711 F.3d 754, 759 (2013), the Court would still find that the allegation is sufficiently supported to stand for the time being. As mentioned above, there is strength in the number of confidential witnesses, their corroborative aspects, and the specific descriptions of each of them. *See, e.g.*, *Makor II*, 513 F.3d at 711–12.

### 1.2.4 ALC Assurances to Shareholders

Throughout this period, despite the problems discussed above, ALC and Bebo continued to provide optimistic statements regarding its status. (*See, e.g.*, Compl. ¶¶ 151–193). ALC and Bebo made these statements in the form of press releases, 10-K and 10-Q annual and quarterly reports, earning conference calls, Sarbanes-Oxley certifications, and correspondence with the Securities and Exchange Commission (SEC). (*E.g.*, Compl. ¶¶ 151–193). Many of the reports contained occupancy data, as well.

More specifically, ALC and Bebo made the following statements, which Pension Trust alleges were fraudulent when made:

(1) In a March 4, 2011 press release, Bebo wrote that "Operating results continue to demonstrate the tremendous potential of our private pay strategy" (Compl. ¶ 151);

(2) In a March 4, 2011 earnings call with investors, Bebo stated that ALC "remain[ed] well positioned to maintain the quality of service our residents have come to expect, while earning strong margins and cash flows for our investors" (Compl. ¶ 153);

(3) In ALC's 2010 10-K Annual Report, issued on March 10, 2011, ALC stated that: (a) the private pay strategy gave the company a competitive advantage and emphasized quality care to residents (Compl. ¶ 154); and (b) that ALC was in compliance with all of its leases (including its Lease with Ventas) (Compl. ¶ 157–58); Bebo executed a Sarbanes-Oxley (SOX) certification attesting to the truth of this submission (Compl. ¶ 159);

(4) In a May 2, 2011 press release, Bebo wrote that ALC made positive strides under its private pay plan (Compl. ¶ 162);

(5) In a May 3, 2011 earnings call, Bebo again asserted that the private pay strategy was a success (Compl. ¶ 163);

(6) In ALC's first quarterly 10-Q report for the year 2011, filed on May 5, 2011 (later amended), ALC asserted that it was in compliance with all of its leases (Compl. ¶ 164); Bebo executed

a SOX certification attesting to the truth of this submission (Compl. ¶ 165);

(7) In an August 4, 2011 press release, Bebo wrote that the private pay strategy continued to be a success (Compl. ¶ 172);

(8) In an August 5, 2011 earnings call, Bebo stated that: (a) the private pay progress continued to be positive (Compl. ¶ 174); and (b) ALC was maintaining and improving the quality of service (Compl. ¶ 175);

(9) In an August 5, 2011 letter response to an inquiry by the SEC regarding the health of the Lease Agreement with Ventas, ALC affirmed that it did not have a reasonably high risk of breaching the Lease Agreement (this letter was signed by John Buono, ALC's Senior Vice President, Treasurer and Chief Financial Officer) (Compl. ¶ 168; Docket #41, at 4–6);

(10) In ALC's second quarterly 10-Q report for the year 2011, filed on August 8, 2011, ALC asserted that it was in compliance with all of its leases (Compl. ¶ 177); Bebo executed a SOX certification attesting to the truth of this submission (Compl. ¶ 178);

(11) In a November 4, 2011 press release, Bebo wrote that the private pay strategy continued to be a success (Compl. ¶ 180);

(12) In a November 4, 2011 earnings call, Bebo stated that the private pay progress continued to be positive and had achieved record-level margins for the quarter (Compl. ¶ 182);

(13) In ALC's third quarterly 10-Q report for the year 2011, filed on November 8, 2011, ALC asserted that it was in compliance with all of its leases (Compl. ¶ 183); Bebo executed a SOX certification attesting to the truth of this submission (Compl. ¶ 184);

(14) In a March 8, 2012 press release, Bebo wrote that the private pay strategy continued to be a success and had increased occupancy (Compl. ¶ 186);

(15) In a March 8, 2012 earnings call, Bebo stated that the private pay progress continued to be positive and had achieved record-level margins for the quarter (Compl. ¶ 187); and

(16)    In ALC's 2012 annual report, filed on March 12, 2012, ALC asserted that it was in compliance with all of its leases (Compl. ¶ 191); Bebo executed a SOX certification attesting to the truth of this submission (Compl. ¶ 192).

For ease of understanding, the Court will group these statements into three separate categories. In essence, the Court agrees with ALC that the representations all deal with one of the following three forms of alleged misrepresentations: (1) misrepresentations that ALC was in compliance with its Lease with Ventas; (2) misrepresentations that the private pay strategy was successful; and (3) misrepresentations regarding occupancy data. (Docket #44, at 6).

### 1.2.5   The Chickens Come Home to Roost

Despite these ample assurances to their shareholders, ALC was having some difficulty, at least in terms of maintaining their facilities at the levels required by state law. As already mentioned, numerous states investigated conditions at ALC's facilities and found violations. (Compl. ¶¶ 39–117). Occupancy rates also continued to decline. (Compl. ¶¶ 28, 95, 116, 119–124, 127–129).

These issues precipitated a quick downward spiral for ALC. First, Ventas discovered the problems in the facilities and sued ALC for breach of the Lease Agreement between them; ALC announced this pending litigation in a May 4, 2012 press release. (Compl. ¶ 133). At the same time, ALC informed shareholders that it had received notices of intent to revoke ALC's licenses to operate three facilities in Georgia and Alabama. (Compl. ¶ 33). ALC also disclosed that it had hired internal investigators to examine irregularities with its Lease Agreement with Ventas. (Compl. ¶ 33).

More trouble followed. On May 10, 2012, ALC failed to file a quarterly report, leading to a 7% decline in its stock price. (Compl. ¶ 134). On May 14, 2012, ALC filed an 8-K report with the SEC addressing the impact of the Ventas litigation, in which ALC reported that its annual net income would potentially decline significantly due to the lawsuit. (Compl. ¶ 135). When ALC finally filed its quarterly report on May 15, 2012, it included additional details about the Ventas litigation (including allegations relating to ALC's default under the Lease); noted that the Ventas litigation could negatively affect other leases, further reducing revenue; and disclosed that private pay occupancy had decreased during the quarter. (Compl. ¶ 136).

As one might surmise, Bebo, as acting president and CEO during this time, did not fare well: on May 29, 2012, ALC announced that it had fired her for cause. (Compl. ¶ 137). Analysts quickly chalked the firing up to ALC's legal and regulatory woes, and, in the days afterward, ALC's stock price declined substantially. (Compl. ¶¶ 138, 139, 140).

On June 21, 2012, ALC announced that it had settled the Ventas lawsuit. (Compl. ¶ 141). Under the terms of the settlement, ALC agreed to pay $97 million to purchase all eight properties it had previously leased from Ventas. (Compl. ¶ 141). The purchase price vastly exceeded ALC's valuation of the properties. (Compl. ¶ 141). ALC also paid an additional $3 million as a settlement fee. (Compl. ¶ 141).

Given these myriad issues, it came as no surprise that ALC's second quarter of 2012 was vastly disappointing. (Compl. ¶ 142). ALC announced on August 3, 2012, that it had sustained a net loss of $25.1 million in the second quarter of 2012—down from $6.3 million of net income in the same

quarter of 2011. Furthermore, ALC's occupancy had declined slightly. (Compl. ¶ 142).

On August 6, 2012, and August 7, 2012, ALC filed 8-K disclosures to comply with the fair disclosure requirements of SEC Regulation FD, 17 C.F.R. §§ 240, 243, and 249. (Compl. ¶¶ 143–144). Therein, ALC disclosed that it would likely need to hire 800 additional employees during the third quarter of 2012, at an expense of approximately $5 million to $6 million, and further that the SEC was investigating ALC's compliance with their Lease Agreement with Ventas. (Compl. ¶¶ 143–144).

As a result of those two disclosures, ALC's stock price dropped by nearly 39% in two days of trading—from $12.86 per share at the close of trading on Friday, August 3, 2012, down to $7.89 per share at the close of trading on Tuesday, August, 7, 2012. (Compl. ¶¶ 143–144). The stock price dipped further after ALC issued its quarterly report on August 8, 2012, in which it made clear that it would need to make substantial staffing and other changes to ensure that the quality of services offered would not suffer. (Compl. ¶¶ 145–148).

### 1.2.6 Shareholders File This Suit Against ALC and Bebo

After the dramatic decline in ALC's stock price, Pension Trust brought suit on behalf of shareholders of ALC stock.[6] Pension Trust alleges that ALC and Bebo engaged in a fraudulent course of conduct by repeatedly representing that ALC was in compliance with its Lease with Ventas, that the

---

[6] In fact, Robert E. Lifson initially filed this suit; the Court, however, appointed Pension Trust as lead counsel, and Pension Trust has taken charge of filing their Amended Complaint and all motions and briefs on behalf of the plaintiffs. (Docket #16). For purposes of addressing the defendants' motions to dismiss, the Court will treat Pension Trust as being the only plaintiff.

private pay strategy was successful, and that occupancy was at positive levels, when in fact each had reason to know that those representations were incorrect.

The defendants have moved to dismiss the plaintiffs' claims, and the matter is now before the Court for decision.

2.    DISCUSSION

Pension Trust makes two claims for relief against both ALC and Bebo.

Pension Trust first claims that both ALC and Bebo violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by making fraudulent representations to shareholders (Compl. ¶¶ 258–266). To state a Section 10(b) claim, Pension Trust must plead the following elements:

(1)    a material misrepresentation or omission by the defendant;

(2)    scienter;

(3)    a connection between the misrepresentation or omission and the purchase or sale of a security;

(4)    reliance upon the misrepresentation or omission;

(5)    economic loss; and

(6)    loss causation.

*Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Pension Trust's second claim—that both ALC and Bebo violated Section 20(a), because each allegedly used its position to control the actions of the other to facilitate Section 10(b) violations (Compl. ¶¶ 267–273)—can proceed *only if* the Court determines that Pension Trust adequately pled a 10(b) claim. *See* 15 U.S.C. § 78t(a) ("Every person who, directly or indirectly, controls any person…shall also be liable jointly and severally with and to the same extent as such controlled person"; in other words, if there was not a

Case 2:12-cv-00884-JPS   Filed 06/21/13   Page 12 of 30   Document 64

Section 10(b) violation by *some* person, then there cannot be any liability by any allegedly controlling person); *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Of course, in addition to the Section 10(b) violation, Pension Trust must also have pled facts that would establish either ALC's or Bebo's control over the other. 15 U.S.C. § 78t(a).

With that general overview of Pension Trust's claims set forth, the Court will now turn to its analysis of those claims. First, the Court must examine the standard of review it must apply in assessing whether to dismiss any or all of Pension Trust's claims. Thereafter, the Court will review the substance of Pension Trust's claims against both ALC and Bebo.

### 2.1 Standard of Review

In evaluating the defendants' motions to dismiss, the Court must determine whether Pension Trust has pled facts that show that its claim of relief is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562–63 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). The pleading standard is heightened, however, in Section 10(b) cases: not only must the plaintiff plead the above-discussed elements of a Section 10(b) claim, they must also do so with a certain particularity. Specifically, the Court should dismiss Pension Trust's claims to the extent that Pension Trust has not pled facts that could, with sufficient particularity, establish the defendants' scienter or identify each allegedly fraudulent statement and facts that would establish their fraudulence. *See, e.g.*, *Makor II*, 513 F.3d at 704 (7th Cir. 2008) (clarifying that plaintiff must establish scienter by showing that defendant either actually knew of the falsity of a statement or recklessly disregarded a substantial risk of falsity); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (conflating Rule 10b-5's required showing with the showing for fraud

under Fed. R. Civ. P. 9(b), and requiring that plaintiffs plead the "who, what, when, where, and how" of each alleged fraudulent representation); 15 U.S.C. § 78u-4(b)(3)(A) (requiring that Section 10(b) plaintiffs specifically identify each misleading statement and state with particularity the facts establishing falsity); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007) (*Makor I*) (noting that the PSLRA imposes a heightened pleading requirement on claims thereunder: "one that exceeds even the particularity requirements of Federal Rule of Civil Procedure 9(b)").

## 2.2    Substantive Analysis

In essence, there are four separate claims that the Court must analyze: two Section 10(b) claims (one as to each defendant), and two Section 20(a) claims (again, one as to each defendant). There is a substantial amount of overlap between Pension Trust's Section 10(b) claim against ALC and its Section 10(b) claim against Bebo. Similarly, Pension Trust's separate Section 20(a) claims against ALC and Bebo share much the same common ground. Accordingly, the Court will address both of Pension Trust's Section 10(b) claims together in a single section, distinguishing between the defendants only when necessary. The Court will do likewise with Pension Trust's Section 20(a) claims.

### 2.2.1   Section 10(b) Claims

As the Court has already noted, Pension Trust asserts that ALC and Bebo made fraudulent misrepresentations, which the Court can classify into three separate groups: (1) statements regarding ALC's compliance with its Lease with Ventas; (2) statements regarding the success of the private pay strategy; and (3) statements (or omissions) regarding occupancy data.

(Docket #44, at 6). The parties address each of these groups separately, and the Court will do the same. To the extent that the Court determines that Pension Trust has not pled sufficient facts to make plausible its allegations of fraud stemming from that group, the Court will dismiss that portion of Pension Trust's Section 10(b) claim, so that the scope of discovery may be appropriately narrowed.

Additionally, the Court notes that, for the purpose of this motion to dismiss, the defendants primarily take issue with the first and second elements of the Section 10(b) claims. That is, the defendants argue that Pension Trust has failed to adequately plead facts that could establish that ALC and/or Bebo had in fact made fraudulent statements or done so with the requisite scienter. Therefore, in addressing the motions to dismiss, the Court will focus on those aspects of Pension Trust's claims.

In other words, for each separate group of alleged misstatements, the Court must ask whether Pension Trust pled facts that could establish that the statements were fraudulent when made. And, second, if the court has found that ALC and Bebo did, in fact, make fraudulent statements, then the Court must next determine whether ALC and/or Bebo made the statements with the requisite scienter (*i.e.* whether ALC and/or Bebo made the statements knowing of their falsity or with reckless disregard for their falsity). Pension Trust may not proceed on its claims unless the Court answers both questions in the affirmative.

### 2.2.1.1   Alleged Misrepresentations

The Court must first determine whether Pension Trust has pled facts sufficient to establish that the three separate groups of ALC's and Bebo's statements amounted to misrepresentations.

Case 2:12-cv-00884-JPS   Filed 06/21/13   Page 15 of 30   Document 64

### 2.2.1.1.1  Compliance with Ventas Lease

Both ALC and Bebo repeatedly asserted that ALC was in compliance with its Lease with Ventas. (See statements 3, 6, 9, 10, 13, and 16 from the list in Section 1.2.4, above). Pension Trust argues that those statements amounted to violations of Section 10(b), and the Court must determine whether Pension Trust pled facts sufficient to establish that violation.

In doing so, the Court first must ask whether Pension Trust has pled facts sufficient to establish that the statements were, in fact, fraudulent when made. Pension Trust has done so.

The contract established multiple ways that it could have been breached or defaulted upon. Specifically, it required that: ALC comply with all laws and insurance requirements; continue to affirm its compliance therewith; notify Ventas if there was any pending or possible litigation that could affect its leased facilities; maintain occupancy at or above a specified level; keep each facility in good repair; not jeopardize its participation in Medicare, Medicaid, or other third-party payor programs; and not make any false or misleading representations to Ventas.

Arguably, Pension Trust has pled facts sufficient to establish that ALC was in violation of at least one of each of those requirements throughout the class period. Of course, as Pension Trust pled, ALC received vast numbers of communications from state agencies citing regulatory investigations and violations throughout the class period. (*See, e.g.*, Compl. ¶¶ 39–97). Those items certainly raise a strong specter of very poor conditions in the leased facilities. And, if the conditions were bad enough to warrant regulatory investigations and citations, then, arguably, it is very possible that ALC was

Case 2:12-cv-00884-JPS   Filed 06/21/13   Page 16 of 30   Document 64

operating in violation of its lease during the class period. Indeed, such alleged facts would support the following violations:

> first, if ALC was under investigation or cited by state authorities, it may not have been in compliance with all laws and insurance requirements throughout the class period, and, by extension, would have been unable to continue its affirmation of compliance (indeed, one need not necessarily *actually* receive a citation to have been out of compliance with the law—the fact that a speeding driver does not receive a speeding ticket does not mean that the driver did not break the law by speeding); and

> second, the conditions in the leased facilities may have been sufficiently low that litigation was possible, that the facilities may have been deemed to be not in good repair, or that ALC may have put its participation in Medicare, Medicaid, or other third-party payor programs in jeopardy.[7]

Any of those facts would establish a violation of ALC's Lease with Ventas.

Additionally, Pension Trust has pled sufficient facts to establish that ALC and Bebo provided Ventas with falsely inflated occupancy numbers. While ALC complains that Pension Trust has failed to specify the precise amount of over-reporting (Docket #59, at 11), the Court believes that such an argument is a red herring. The mere fact of over-reporting was likely a breach of the contract. Thus, the fact of over-reporting alone, as adequately alleged by Pension Trust, would establish that ALC breached its Lease with Ventas by providing false representations.

For all of these reasons, it is clear that Pension Trust has pled facts sufficient to establish that ALC and Bebo provided false statements when they stated that ALC was in compliance with its Lease with Ventas.

---

[7] On this latter note, the Court should mention that the Secretary of the Department of Health and Human has the ability to terminate a hospital's participation in Medicare, for example, if he or she deems the facility to be out of compliance with Medicare regulations. *See* 42 U.S.C. §§ 482.11(b) and (c), 1395x(e).

Accordingly, the Court is obliged to analyze this claim to determine whether Pension Trust has pled that ALC and Bebo possessed the requisite scienter to make the claim viable.

### 2.2.1.1.2  Success of Private Pay Strategy

Pension Trust also identifies ALC's and Bebo's statements praising the private pay strategy as misrepresentations.[8]  (See statements 1, 2, 3, 4, 5, 7, 8, 11, 12, 14, and 15 from the list in Section 1.2.4, above). This argument is much more dubious.

With regard to the statements, Pension Trust argues that ALC and Bebo lied by stating that the private pay strategy improved the business' financial position and allowed it to maintain its quality of service, when in fact the opposite was true. (*See* Docket #58, at 8–9).

Courts, however, have avoided treating "puffery" or "vaguely optimistic statements" as material misrepresentations that could give rise to liability. *See, e.g.*, *Silverman v. Motorola, Inc.*, 07-C-4507, 2008 WL 4360648, at

---

[8] The Court must also note that Pension Trust, in its response brief, argues that ALC and Bebo omitted material facts, which it alleges constitutes a violation of Section 10(b). (*See, e.g.*, Docket #58, at 8–14). In support thereof, Pension Trust refers to the poor conditions inside of the leased facilities, as evidenced by regulatory investigations and statements of confidential witnesses. This is a dramatic reversal from the allegations in the amended complaint, which center much more closely around actual statements regarding the business success of the private pay strategy and conditions inside the facilities. This sort of quick shift in argument is entirely inappropriate. Pension Trust has not identified any specific omissions in its amended complaint. Moreover, ALC and Bebo disclosed the effects of the private pay strategy to ALC's shareholders in their 10-K forms. Thus, Pension Trust's claims are not actually challenging an omission, but are instead alleging corporate mismanagement, which is not actionable under Section 10(b). *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977); *Fry v. UAL Corp.*, 895 F. Supp. 1018, at 1042–43 (N.D. Ill. 1995) (cataloging cases in which the Seventh Circuit held that allegations of corporate mismanagement or breach of fiduciary duty cases are not actionable under federal securities laws).

*9–*10 (N.D. Ill. Sept. 23, 2008) (citing *In re Midway Games, Inc., Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004); *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996); *Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1129–30 (2d Cir. 1994)).

That rule of law applies to many of ALC's and Bebo's statements in this case. A majority of the statements identified by Pension Trust regarding the success of the private pay strategy were merely vague corporate puffery, which the Court should not treat as material misrepresentations. Specifically, statements 1, 3, 4, 5, 7, 8, 11, 12, 14, and 15, all contain statements praising the success of the private pay strategy. But each of those statements is vague, or contains data points that Pension Trust does not argue were in error. Rather, Pension Trust argues that, holistically and subjectively, the private pay strategy was a failure. Indeed, the private pay strategy may have ultimately been a bad business decision. But "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Shields*, 25 F.3d at 1129–30. Additionally, the Court does not believe that these representations could possibly have been considered material, because any reasonable investor would look beyond general statements of corporate success when investing. That is, any reasonable investor would look at business results of a given company's strategy, rather than relying solely upon representations of an employee that the strategy was a success. As the defendants argue, such statements are simply too subjective to be deemed material misrepresentations. Thus, here, the Court is obliged to conclude that

ALC's and Bebo's statements on the success of the private pay strategy were mere corporate puffery and not material misrepresentations.

Bebo's statements on the quality of service at the leased facilities presents a much closer call. Pension Trust has identified two statements regarding quality, which it asserts constituted misrepresentations.

The first of those statements, found in statement 2 above, is not a material misrepresentation. Bebo made this statement during an earnings call, in which she stated that the implementation of the private pay strategy allowed ALC to remain "well positioned to maintain the quality of service our residents have come to expect, while earning strong margins and cash flows for our investors." (Compl. ¶ 153). Pension Trust argues that this was a material misrepresentation, because the private pay strategy actually decreased the quality of service. The defendants have not pled facts sufficient to show that this was, in fact, a misrepresentation, though. As sad as this may be, the defendants have not pled any facts that would establish that residents *ever* expected good quality of service. As with the vague statements above, this statement is simply too general to support a finding that it is a material misrepresentation.

The Court must also hold that the second of the statements, found in statement 8 above, is not a material misrepresentation. Statement 8, again made by Bebo during a conference call, asserted that ALC had obtained cost savings by improving "the expense side while still maintaining or improving the quality of what we have in service or items." (Compl. ¶ 175). This statement is extremely nonspecific. All that Bebo asserted was that the quality of service *or* items had at least remained consistent. Again, Pension Trust has failed to provide the Court with facts to establish an adequate

baseline. Moreover, Pension Trust has failed to show that the quality of items in the leased facilities began to decline. Thus, the Court is obliged to conclude that Pension Trust has not pled facts sufficient to support its allegation that this statement was a material misrepresentation.

Finally, the Court notes that, while this detailed analysis of ALC's and Bebo's statements may seem to be nit-picking, it is very important to weed out allegations of true misrepresentations from mere puffery or vague statements regarding quality. Practically speaking, any corporation—whether successful or not—occasionally shades the truth regarding the services it provides and the quality of its business model. Every executive believes in the success of his or her own plan, and will say as much to investors and potential investors. The Court is reluctant to hold that such positive generalities rise to the level of material misrepresentation. Surely, every investor must also have some responsibility to verify that vague statements of success are, indeed, true.

For all of these reasons, the Court is obliged to conclude that ALC's and Bebo's statements regarding the private pay strategy were not material misrepresentations. Accordingly, the Court is obliged to grant the defendants' motions to dismiss in this regard.

### 2.2.1.1.3  Occupancy Data

The last of Pension Trust's allegations centers around ALC's and Bebo's alleged overstatements or omissions of the correct occupancy data. On this topic, Pension Trust points out that Bebo asserted in a press release that the private pay strategy had increased occupancy levels. (See statement 14 from the list in Section 1.2.4, above). Pension Trust also alleges that fraudulent occupancy data was disclosed in two earnings calls. (Compl.

¶¶ 152, 187). The allegations may also encompass ALC's 10-K statements, which included information on occupancy data. Further, in its response brief to the Court, Pension Trust argues that ALC and Bebo failed to disclose ALC's practices of over-reporting occupancy, thus making a material omission. (*See* Docket #58, at 15–16).

To begin its analysis on this topic, the Court must note the deficiencies in Pension Trust's amended complaint and response brief. In both, Pension Trust avoids specifically identifying what it asserts to be ALC's and Bebo's misstatements and omissions. Instead, Pension Trust simply asserts as many individual facts as possible, never drawing them together into a cogent statement of a claim.[9] Moreover, Pension Trust's response brief simultaneously fails to bring the threads together into a cogent claim while shifting the sands even further by arguing that ALC and Bebo omitted facts regarding the calculation of ALC's occupancy data. Indeed, the Court's identification of the alleged misstatements or omissions, above, was purely an act of synthesis by the Court. The Court has yet to receive a submission from Pension Trust that clearly states *precisely* where ALC or Bebo made either a misstatement or omission.

This leaves the Court in the precarious position of attempting to identify Pension Trust's actual allegations. The fact that the Court has to delve this deeply into identifying Pension Trust's claims is likely grounds for dismissal in itself. Nonetheless, the Court will do what it can to suss out and evaluate Pension Trust's claims.

---

[9] This is an issue throughout Pension Trust's Amended Complaint, but is particularly egregious with reference to the claims regarding occupancy data.

First, Pension Trust has failed to allege facts that would establish the fraudulence of statements in press releases or earnings calls that reported increased occupancy. While those statements—one in a press release and two during earnings calls, found at paragraphs 152, 186, and 187 of the amended complaint—did, indeed, make specific contentions about increased occupancy, Pension Trust has not identified *any* fact that would establish the statements were incorrect in any way. Therefore, the Court must conclude that Pension Trust has failed to adequately state a claim stemming from those representations.

Second, Pension Trust has stated a claim regarding the fraudulence of ALC's 10-K and 10-Q disclosures—though they have barely done so. The 10-K and 10-Q forms included occupancy data. (*See* Docket #44, at 10–11 at fns. 11–12). But Pension Trust has not pled any facts that would establish that those numbers were false. Certainly, Pension Trust has not pled any facts regarding the true and correct occupancy rates for the periods. Such information would have clearly stated a claim.

Instead, Pension Trust has taken the difficult path of using confidential witnesses to support its claims. A number of those confidential witnesses stated that they were aware of certain of ALC's practices to inflate occupancy numbers. (*See, e.g.*, Compl. ¶¶ 45, 67, 87, 88, 92, 116, 117, 119, 120, 121, 122, 123, 125, 126, 127, 128, 129, 130, 131, 132, 200, 206, 216, 218, 224, 225, 226, 228, 230, 231, 232). However, for various reasons, many of those statements do not provide support for Pension Trust's allegations that the 10-K and 10-Q statements included falsified occupancy data. To begin, a majority of the confidential witnesses did not have contact with the 10-K and 10-Q reports during the period in question. For example, CW 5, CW 9, and CW 12 were

in management positions, but never made any statements that they had seen inflated data in the 10-K and 10-Q reports. (*See, e.g.*, 67, 119, 120, 121, 125, 126, 127, 131, 200, 206, 216, 226). Others, including CW 7 and CW 8, were not employed by ALC during any period that Pension Trust claims ALC issued fraudulent statements; therefore, they cannot have any knowledge of fraudulently reported data. (Compl. ¶¶ 19(g–h)).

There are, however, two assertions that ALC overreported its occupancy data in its 10-K and 10-Q reports. CW 2 was an accountant and informed Pension Trust that he or she had seen reports which overreported occupancy data. (Compl. ¶ 131). Likewise, CW 6, a regional marketing director and later a residence director, also informed Pension Trust that he or she had seen vast differences between ALC's internal reports and the numbers reported publicly, raising the specter of fraud in the 10-K and 10-Q reports. (Compl. ¶ 123). While the Court has some reservation about crediting these two confidential statements, its fears are assuaged by the fact that—while the other confidential witnesses may not address over-reporting in the 10-K and 10-Q forms—the other confidential witnesses report severe occupancy reporting problems, all of which lend credence to CW 2's and CW 5's statements regarding over-reporting on 10-K and 10-Q forms. Accordingly, the Court is obliged to find that Pension Trust has pled facts sufficient to establish its claim that ALC and Bebo made material

misrepresentations regarding occupancy data by supplying incorrect data in ALC's 10-K and 10-Q reports.[10]

Third, Pension Trust's arguments that ALC and Bebo omitted pertinent facts regarding occupancy data fails to state a claim. (Docket #58, at 15–16). On this matter, the Court agrees with ALC: Pension Trust has gone too far in blurring the line between affirmative misrepresentation and omission. (Docket #59, at 1). Effectively, Pension Trust argues that ALC and Bebo "omitted" facts regarding how the ALC reached its occupancy data. While technically true, this is simply another way of arguing that ALC calculated and reported its data in a fraudulent way. Therefore, the Court will disregard this argument.

Finally, the Court must also note that, to the extent that Pension Trust attempts to argue that ALC and Bebo made fraudulent statements or omissions to Ventas regarding occupancy data (Docket #58, at 16), such contentions lie entirely inside Pension Trust's claim that ALC and Bebo made material misrepresentations regarding compliance with the Ventas Lease. In essence, Pension Trust is attempting to argue that a misrepresentation to a third party constitutes a misrepresentation to shareholders. That position is simply untenable.

For these reasons, the Court is obliged to dismiss Pension Trust's claims regarding inflated occupancy levels, except insofar as Pension Trust argues that ALC overreported its occupancy data in its 10-K and 10-Q forms.

---

[10] In this regard, the Court notes that it has taken into account ALC's argument that its publicly-reported occupancy data disclosed declining occupancy rates, and therefore was not misleading. (Docket # 59, at 2–3). While, indeed, it may be true that ALC reported declining occupancy rates, the issue is whether those rates were *still* overstated by ALC's misreporting.

On this latter claim, the Court must still determine whether ALC and Bebo possessed the requisite scienter to make the claim viable.

### 2.2.1.2 Scienter

Having determined that Pension Trust did, indeed, plead facts sufficient to establish actual misrepresentations as to the lease and 10-K occupancy report claims, the Court must next determine whether Pension Trust also pled facts sufficient to establish scienter on their behalf. If Pension Trust has not pled facts sufficient to establish scienter, then the Court must dismiss Pension Trust's remaining claims.

Scienter is a state of mind "embracing intent to deceive, manipulate, or defraud," and includes reckless disregard for the truth in the Seventh Circuit. *Tellabs*, 551 U.S. at 319; *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). However, to qualify as scienter, this recklessness must be "an extreme departure from the standards of ordinary care…to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Makor II*, 513 F.3d at 704 (internal quotations omitted). To determine whether scienter exists, the Court must examine all of the allegations to determine whether an inference of scienter would be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. This often depends on the plausibility of other explanations for the action; in other words, the greater extent to which innocent explanations for an action may be ruled out, the greater the plausibility of scienter. *Makor II*, 513 F.3d at 711.

To establish ALC's scienter, the Court must look to "the state of mind of the individual corporate official or officials who make or issue the statement." *Makor II*, 513 F.3d at 708. Further, any individual who "make[s]"

an untrue statement of fact in connection with the purchase of securities is liable under Rule 10b-5. 17 C.F.R. § 240.10b-5(b). Thus, because Bebo made statements in press releases and earnings calls, the Court can attribute those statements to ALC and also to her. Similarly, by signing SOX certifications attesting to the truth of ALC's 10-K and 10-Q reports, Bebo clearly took responsibility for issuing those statements, and they can be attributed to both ALC and to her, individually.

Given this legal backdrop, the Court finds that Pension Trust has clearly stated facts sufficient to establish scienter on both ALC's and Bebo's behalf. Pension Trust has pled facts sufficient to establish that Bebo received practically every notice of state investigations and citations, and thus was clearly aware of the condition issues that put ALC in violation of its lease with Ventas. (Compl. ¶¶ 205, 206, 209, 210, 213). They have also pled facts that establish her extremely close oversight of occupancy data, all the way down to raising concerns about individual residents. (*See, e.g.*, Compl. ¶¶ 31, 32, 123, 216, 222, 223). Thus, when she stated and certified that ALC was in compliance with the Lease and provided occupancy data, she did so with at least a reckless disregard for the truth that the ALC was, in fact, both out of compliance and falsely overstating its occupancy data. As such, Pension Trust has stated facts sufficient that both Bebo and, by extension, ALC acted with scienter in issuing press releases, participating in earnings calls, and submitting 10-K and 10-Q forms, which included false information regarding ALC's compliance with the Ventas Lease and overstated occupancy data.

As such, the Court is obliged to deny the defendants' motions to dismiss Pension Trust's Section 10(b) claims, insofar as Pension Trust asserts that ALC and Bebo violated Section 10(b) by making material

Case 2:12-cv-00884-JPS   Filed 06/21/13   Page 27 of 30   Document 64

misrepresentations concerning ALC's compliance with the Ventas Lease and falsely overstating occupancy data in its 10-K and 10-Q reports.

### 2.2.2    Section 20(a) Claims

Pension Trust has also alleged that both Bebo and ALC violated Section 20(a) by controlling the other to induce the Section 10(b) violation. (Compl. ¶¶ 267–273). ALC argues (very briefly, in its opening brief) that the Court should dismiss this claim, because Pension Trust has failed to state any Section 10(b) violation. (Docket #44, at 23).

The Court will not dismiss Pension Trust's Section 20(a) claims to the extent they rest upon Section 10(b) claims that the Court determines it should not dismiss. As the Court has already noted, it finds that Pension Trust has adequately stated a Section 10(b) as to a portion of its allegations. Additionally, Pension Trust has alleged that both ALC and Bebo had the power or ability to control the other. Those two factors are all that is required to state a Section 20(a) claim; whether either ALC or Bebo is, in fact, a controlling person is an issue that cannot be decided at the pleading stage. *See, e.g.*, *In re Sears, Roebuck and Co., Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (citing *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1138–39 (7th Cir. 1992); *Lindelow v. Hill*, 2001 WL 830956, at *9 (N.D. Ill July 20, 2001); *In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924, 943 (N.D. Ill. 1996)). Thus, to the extent that the Court has found that Pension Trust has adequately stated a violation—as relates to the Lease compliance and 10-K and 10-Q issues—it may also maintain its Section 20(a) claims against both ALC and Bebo.

Therefore, the Court must deny ALC's motion to dismiss Pension Trust's Section 20(a) claims, insofar as those claims relate to Section 10(b)

claims that the Court does not dismiss within this order. As to all other Section 20(a) claims that Pension Trust may have raised, such as those based upon the success of the private pay strategy or non-10-K/10-Q occupancy statements, which the Court dismisses in this order, the Court is obliged to grant ALC's motion to dismiss.

3.     CONCLUSION

In sum, the Court will grant in part and deny in part both ALC's and Bebo's motions to dismiss. Specifically, the Court will grant those motions as to Pension Trust's claims that ALC and Bebo made material misrepresentations in their statements regarding the success of the private pay plan or in their non-10-K/10-Q statements regarding occupancy data. To the extent that Pension Trust's Section 10(b) claim relied upon allegations of that nature, they may no longer pursue that claim and the parties need not engage in discovery to assess further facts on those issues. However, the Court must deny ALC's and Bebo's motions as to Pension Trust's claims that assert misrepresentations stemming from statements regarding the Ventas Lease or concerning occupancy rates, as stated in ALC's 10-K or 10-Q submissions.

Accordingly,

IT IS ORDERED that the motions to dismiss of Laurie Bebo and Assisted Living Concepts, Inc. (Docket #40, #43, respectively), be and the same are hereby GRANTED in part and DENIED in part;

IT IS FURTHER ORDERED that, pursuant to the Court's partial grant of the defendants' motions to dismiss, and in accordance with the Court's discussion above, Pension Trust Fund for Operating Engineers' Section 10(b) and Section 20(a) claims be and the same are hereby

DISMISSED to the extent that they assert misrepresentations stemming from the defendants' statements regarding the private pay strategy and representations regarding occupancy outside of ALC's 10-K and 10-Q submissions; however, the Court will not dismiss Pension Trust's Section 10(b) and Section 20(a) claims to the extent that those claims arise from the defendants' alleged misrepresentations regarding ALC's compliance with the Ventas Lease or occupancy data allegedly overreported in ALC's 10-K and 10-Q submissions.

Dated at Milwaukee, Wisconsin, this 21st day of June, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Case 2:12-cv-00884-JPS   Filed 06/21/13   Page 30 of 30   Document 64